**DICK BROWN, PH.D.**
COUNSELING PSYCHOLOGIST
9055 SHADY GROVE COURT
GAITHERSBURG, MD 20877

7700 OLD BRANCH AVENUE
SUITE B105
CLINTON, MARYLAND 20735

(301) 948-6968
FAX (301) 948-4333
E-MAIL: DICK.BROWN@JUNO.COM

## FORENSIC PSYCHOLOGICAL EVALUATION

Name: Lawerence Battle
Date of Birth: May 18, 1947

### REFERRAL QUESTION

Lawerence Battle, a married 51 year old African American man with a 33 year history of government employment, requested psychological help with issues related to a long standing dispute with the Federal Aviation Administration (FAA). One pressing issue involves whether or not a psychological (or emotional) disability was sustained on August 5, 1998 and whether or not that injury is causally related to workplace stress.

### DATES OF EXAMINATION AND TREATMENT

| Date | Duration | Activity |
|---|---|---|
| 8/19/98 | 45 minutes | Clinical Interview |
| 8/21/98 | 125 minutes | MMPI-2, WAIS-R, BECK |
| 8/25/98 | 60 minutes | Rorschach |
| 8/31/98 | 60 minutes | BDI, MAST, NSC, PPCA, Interview |
| 9/ 8/98 | 90 minutes | Clinical Interview |
| 9/14/98 | 60 minutes | Clinical Interview |
| 9/29/98 | 60 minutes | Clinical Interview |
| 10/9/98 | 60 minutes | Clinical Interview |
| 10/12/98 | 70 minutes | Clinical Interview |
| 10/20/98 | 60 minutes | Clinical Interview |
| 10/21/98 | 60 minutes | Clinical Interview |
| 10/27/98 | 60 minutes | Clinical Interview |
| 11/03/98 | 60 minutes | Clinical Interview |
| 11/09/98 | 30 minutes | Clinical Interview |
| 11/10/98 | 150 minutes | Clinical Interview |

Test scoring and interpretation, collateral interviews, documents review, phone consultations, report write-up, and correspondence took place at other miscellaneous times  This phase of the evaluation consumed 20 hours

1

Battle, Larry

## PERSONAL HISTORY

Mr. Battle was born on May 18, 1947, in Hawkinsville, Georgia to a farmer and housewife. He is one 12 siblings ranging in age from 44 to 67. Both parents are deceased. He is happily married and has a 12 year old daughter. His health is good although "job related stress" is blamed for periodic stomach pain and muscle tension. Mr. Battle has no hearing problems, and wears glasses to correct a far sighted vision problem. There have been no childhood or recent illnesses or diseases and drug or alcohol use was denied. He filed a stress related workman's compensation claim (which was denied) resulting in missed work between September 3, 1997 and November 12, 1997. He has not been working since August 5, 1998 because of workplace stress. No family members experienced physical or emotional illnesses, mental retardation, or drug/alcohol abuse. Mr. Battle denied food allergies, and does not exercise on a regular basis. He reported no school problems, and math, chemistry, and science were his favorite subjects. He completed four years of college credits but has no degree. Currently employed as a GS/FG-14 Management and Program Analyst at the FAA Headquarters in Washington, DC, he has had various positions with the agency since 1973. Prior to the FAA service he worked for the US Postal Service, and was honorably discharged from the US Army in 1970. He described himself as restless, irritable, friendly, dependable, and unhappy. Hobbies and interests include sports, travel, shopping, reading, and sightseeing.

## HISTORY OF INJURY

A long, complicated history of racial tension between the claimant and the FAA resulted in various EEO complaints Mr. Battle sustained a psychological injury on August 5, 1998 causing a generalized anxiety disorder to solidify. He became unable to work and requires ongoing psychological treatment to address the problem. The August 5, 1998 injury is causally related to the psychological disability which prevents him from working. He said, regarding the August 5, 1998 incident, "It had gotten to the point that it was intolerable at Headquarters. On August 5, 1998 at 9 a.m. I had to leave work because I could no longer function under existing conditions. I realized I had a problem and went to Gail Feagans for stress treatment."

The immediate precursor, but part of a long pattern of misconduct by the FAA, involved a signed resolution agreement dated July 1, 1998 to settle an EEO Discrimination Dispute regarding the FAA breaking into his official personnel file, a fact that has been established.. The date of discussion entry on his performance appraisal from July 1, 1994 through March 31, 1995 was falsified. The falsification lowered the appraisal rating which denied extra credit points with the potential to adversely effect the probability that he would be selected for future FAA positions. The specific resolutions remain confidential

2

as part of the settlement but were agreed to by all parties. Closure to this segment of a long and arduous battle appeared imminent after the agreement was signed on July 1, 1998, but the FAA reneged on it's agreement. This breach caused Mr. Battle such distress that he could not work after 9 a.m. on August 5, 1998. Overwhelming anxiety and worry caused significant distress and impairment in work (and other areas) functioning, causing Mr. Battle to leave work. The anxiety is causally related to the FAA's nonadherence to the agreement of July 1. 1998 and fully manifested itself on August 5, 1998.. Despite less than ideal settlement terms, Mr. Battle accepted their offer as part of his attempt to put things behind him and move forward. He said, "At least it is a first step and one part of this struggle will be finished." However, the FAA's lack of adherence to it's offer was more than the claimant could emotionally manage . He subsequently submitted a workman's compensation claim because of this inability to work.

A second EEO complaint (93-0292) was submitted on May 26, 1993 alleging retaliation and reprisal for filing the first complaint (92-0318). Negotiations are underway to finalize the FAA offer made on October 29, 1998 to settle the second EEO complaint (93-0292). Thus, when the attorney's finalize the details, Mr. Battle will have resolved the legal portions of his complaints. However, he has been conditioned to fear additional repercussions from FAA authorities, and the psychological aftereffects of their behaviors remain. Since the FAA has established a pattern of misconduct toward Mr. Battle, his anxiety (intense dread, apprehension) about similar future actions remains.

The FAA has a history of documented and externally verified actions adversely effecting Mr. Battle. They have acted erroneously and abusively in matters. These actions are causally related to the generalized anxiety disorder giving rise to the workman's compensation claim. For example, he accumulated nearly $4000.00 in legal bills directly related to an agreement to submit to Alternative Dispute Resolution mediation on September 14, 1994 but the FAA management team was unprepared to negotiate at the agreed upon time. This caused Mr. Battle to withdraw from the University of Maryland in the fall of 1994 despite the fact that he made the Deans List for the fall semester, 1992. Mr. Battle also voluntarily initiated individual psychotherapy to help manage his stress immediately after this episode. The FAA also failed to honor settlement agreements and illegally completed and subsequently destroyed personnel (appraisal) records with the potential to directly impact the most recent Court case which is close to being settled. The records destruction was acknowledged during a recent deposition. The original complaint (92-0318) was "settled" when the FAA agreed to assign Mr. Battle to three 120 day details and a two week management training course but they did not fully implement the agreement. Consequently, the Department of Transportation (DOT) ordered the FAA to reopen complaint 92-0318 for not honoring the settlement agreement.

Mr. Battle stated, "They continually lie and thats why I am having all of these problems. The lying is continual. Even if you go to the highest levels they still lie."

Mr. Battles originally sought stress relief treatment from Gail Feagans, Nurse Psychotherapist, in 1995. He saw her approximately 11 times, and was able to continue working with outpatient treatment. He stated, "After I saw Gail I was doing fine until I found out they broke into my records." Records tampering charges were ultimately substantiated, and on August 29, 1997, a Notice of Traumatic Injury and Claim for continuation of Pay and Compensation was filed. Mr. Battle reinitiated contact with Ms. Feagans for additional stress management treatment, and he was referred to for a forensic psychological evaluation. The procedure was explained, and he decided not to undergo a forensic evaluation at that time. Mr. Battle was given a letter on September 11, 1997 recommending a 30 day leave of absence to get a handle on his stress. The letter did not provide a diagnosis or an opinion regarding a causal relationship between records alteration and the traumatic injury claim because the claimant did not undergo the necessary evaluation to form an opinion. However, the current forensic evaluation addresses the pertinent questions

COLLABORATIVE INTERVIEWS

Gail Feagans, Clinical Specialist in Psychiatric Nursing, was consulted on November 8, 1998 regarding her treatment of Mr. Battle. He got her name from Johns Hopkins University because of stress management expertise. She first interviewed Mr. Battles on October 3, 1994. He became "stressed out" following the FAA's noncompliance with the Alternative Dispute Resolution (ADR) process of mediation which was scheduled for September 14, 1994. The meeting was rescheduled because the FAA was "unprepared." The second meeting was subsequently canceled by the FAA and Mr. Battle realized that he was having emotional problems due to their misconduct. Within two weeks, he saw Ms. Feagans and voluntarily initiated treatment. She started a course of biofeedback training to help him deal with "muscle tension, emotional distress, fatigue, insomnia, and distractibility." attributed to the problems with the FAA. He reported to Ms. Feagans that he was experiencing "reprisals, retaliations, and getting the run-around by the FAA.' The initial course of treatment took 17 visits (from October 3, 1994 to March 16, 1995) and was followed by monthly "tune ups" in May, June, and July of 1995. During treatment he referred to the FAA's tendency to "ignore deadlines and breaching the settlement agreement."

Mr. Battle resumed biofeedback training for stress management on September 4, 1997 after discovering that the FAA had altered personnel documents which could adversely influence pending litigation. Ms. Feagans realized the legal implications of the case and

4

referred Mr. Battles to me for a forensic evaluation. He did not desire the forensic workup at that time but was given a letter informing the FAA that he would benefit from 30 days of leave to get a handle on his stress. Mr. Battle saw Ms. Feagans 12 times between September 4, 1997 and December 9, 1997. During this time Mr. Battle filed a workman's compensation claim for traumatic injury but the claim was denied due primarily to lack of documenting evidence.

Ms. Feagans currently treats Mr. Battle for ongoing stress and anxiety and has seen him eight times since he resumed treatment in August, 1998.

Mr., Loren Kropat, former co-worker, was telephonically interviewed on November 8, 1998. He and Mr. Battle worked in close proximity ("about three feet apart in 1996 and 1997") at Headquarters in Washington, DC. Mr. Kropat said, "Larry has been in a dead end position because he took on the agency. He was put in a dumping ground and has not been given anything meaningful to do for a long time." Mr. Kropat reported that "the system stonewalled him" and "Larry absorbed it and it ate away at him." He believes the FAA gave Mr. Battle "the cold shoulder but he continued to trust the system." The work environment was described as "like being in a jail because everyone was stripped of meaningful work and got no feedback." The employees who used EEO or the Civil Rights Agency "got the door slammed in their face." Mr. Kropat noted, "The last time I saw Larry face to face was in August or September of 1998. He was totally demolished and looked so uptight it was unbelievable. He was so pent up with energy and he used to be so calm. He was noticeably different when I saw him. To me the FAA destroyed Larry psychologically. He had everything under control at first and he was pursuing his case through all the right channels. He was fighting a good fight but they were just goofing with him and he was too naive to see it. Larry has been set up and he is a marked person. He plays their game and they shut him down. It's unbelievable how they act. They will contract something and then not follow through." When asked if Larry changed over the years, Mr. Kropat stated, "By the end Larry could no longer function. He was jumping all over the place, was disjointed, and at times did not make sense. He had no ability to put things into perspective and all he could see were the details. I'd go for months without seeing Larry and the changes were very noticeable. The last time I say him he looked sick. It wasn't the same Larry. He had totally lost his quiet sense of humor and appeared to be grasping at straws."

Mr. Kropat was of the opinion that Mr. Battle was placed in his current position as a retaliatory move on the part of the FAA. The organization he was in had no power and the supervisors and other workers "were not team players." Mr. Kropat said, "They did not fit anywhere within the organization. People here did not care about operations (and

FAA is an operations sort of place) and the supervisors were put there because they could not be dealt with anywhere else. It was a dumping ground for problem employees."

Mr. Kropat attributed Mr. Battle's emotional condition to the following:
- He was made an outcast
- He became an invisible man, was totally ignored, and did not exist
- He became extremely frustrated when he realized that they were not going to do anything for him despite the regulatory requirements
- They worked on his mind by dehumanizing him
- They became vindictive toward him because they needed to get rid of him
- They saw no value in him
- He started being retaliated against when he started helping a disgruntled co-worker

Chuck Nelms, a fellow FAA employee (SSE Field Office Manager) and friend since 1977, was interviewed on November 11, 1998. He reported that Mr. Battle has changed significantly since he started the discrimination complaints against the FAA. Mr. Nelms stated, "They are waiting for Larry to die off so this whole thing will just go away. Larry is concerned about a conspiracy." Mr. Nelms described the FAA as an authoritarian, militaristic, bureaucracy. He said, "When you upset the big boys upstairs its pretty easy for them to apply pressure, and thats what they have done to Larry." Mr. Nelms was asked to describe how Larry has changed. He said, "He used to be so happy go lucky and now he is suspicious. Larry is different now. I've seen this take a toll on him and for me it has been a long, painful process to see what it has done to him." Mr. Nelms was not selected for a position he applied for despite being the "best and most qualified applicant." He considered filing an age discrimination complaint but decided not to. His reasoning was as follows: "I wasn't going to let the organization do to me what it had done to Larry. I was wronged but I let it go because I wouldn't want what happened to Larry happen to me." Mr. Nelms summarized the difficulties when he said, "The workplace has definitely impacted Larry." Finally, they used to maintain weekly phone contact but now only talk monthly or "once every five weeks or so."

TEST RESULTS

Extensive clinical interviews, records review, consultations with outside parties, and psychological testing formed the basis of the findings related to the referral questions. Psychological testing (see above for dates) consisted of the Wechsler Adult Intelligence Scale-Revised (WAIS-R), Minnesota Multiphasic Personality Inventory-Two (MMPI-2), Rorschach, Beck Depression Inventory (BDI), Michigan Alcoholism Scale Test (MAST),

6

Personal Problem Checklist for Adults (PPCA), and Neuropsychological Symptom Checklist (NSC).

The WAIS-R FULL SCALE IQ of 86 (18th percentile) placed Mr. Battle in the middle of the Low Average range of intellectual functioning. The FSIQ was composed of a VERBAL IQ of 96 (40th percentile) and a PERFORMANCE IQ of 77 (6th percentile). This statistically significant split between the VERBAL and PERFORMANCE IQ scores is characteristic of anxiety, tension and depressive conditions. Given Mr. Battle's recent work related stress, past academic accomplishments (i.e., Dean's list 2/93, University of Maryland GPA of 3.416 based on 36), work achievements (he was the first black Principal Evaluator in the Eastern Region for FAA and attained a GS-14 rating) the currently attained IQ is much lower due to the negative impact of emotional factors on intellectual functioning. There was no indication on the WAIS-R of a thinking disorder, and the findings were consistent with situational stress hindering cognitive clarity. Concentration difficulty and distractibility hampered performance on the non-verbal portions of the WAIS-R. He noted, "I would be doing one of the tasks and suddenly I'd be thinking about something else, and I was not on the item anymore." The WAIS-R Scaled score subtests were as follows:

| VERBAL | | PERFORMANCE | |
|---|---|---|---|
| Information | 6 | Picture Completion | 5 |
| Digit Span | 8 | Picture Arrangement | 4 |
| Vocabulary | 9 | Block Design | 4 |
| Arithmetic | 10 | Object Assembly | 5 |
| Comprehension | 11 | Digit Symbol | 5 |
| Similarities | 10 | | |

The NSC was administered to screen for obvious Neuropsychological problems. Mr. Battle acknowledged periodic blurred vision, memory problems, difficulty thinking as clearly as before, is more easily distracted, can't concentrate, has trouble finding the right word when talking, has trouble with his speech, experiences stress, anxiety and tension, and has lost interest in many activities.

The BDI supported mild depression. Mr. Battle feels sad, does not enjoy things like he used to, feels as though he is being punished, becomes more easily irritated, is less interested in people, has decision making difficulties, is worried about his appearance, has sleep and appetite difficulties, is less interested in sex, is worried about physical problems, and is easily tired. Suicidal ideation was denied

The MAST was unremarkable and contained no evidence that there is problematic alcohol use. In fact, Mr. Battle stated, "I very seldom drink. My friends and relatives don't think I am a normal drinker because I don't drink."

The PPCA indicated the following problems:
- Afraid of being fired or laid off
- Working in unsafe conditions
- Job created health problems
- House repairs needed
- Having to spend savings
- Unable to pay medical bills
- Having unpaid bills
- feeling anxious or uptight
- Having trouble concentrating
- Not remembering things
- Getting too emotional
- Not being able to stop worrying
- Not being able to relax
- Worrying about sexual performance
- Needing legal advice
- Having poor sleeping habits
- Having physical disability
- Not having any interest in things

The MMPI-2 validity scales indicated that the test was approached in an open and honest manner, resulting in a valid profile. The test contained five significantly elevated clinical scales revealing mixed and complicated psychological features. The striking element of the MMPI-2 is that Mr. Battle may be seen as blandly repressive in regard to hostile and aggressive impulses. He is hard to get along with for certain individuals because of prominent underlying hostility. On another level, the MMPI-2 revealed the "distress symptom" (depression, anxiety, nervousness) and obsession characteristics. The depression is mainly expressed by feelings of hopelessness. He is an intellectualizer complaining of concentration and thinking difficulties. He suffers from indecision, doubt, and is described as a fearful worrier with self confidence doubts. Similar scorers engage in suicidal ruminations but he denied such thoughts. Weakness, fatigue, and loss of interest and initiative is also problematic. Finally, he tends to withdraw, and can be socially distant and introversive.

The Rorschach Structural Summary indicated that the test was valid. The Coping Deficit Index was positively elevated, suggesting reactive depression. Cognitive activity was characterized by disarray and slippage as evidenced by multiple unusual verbalizations. The cognitive dysfunction was at the lowest level and revealed a "peculiar" quality to his thinking. However, the Rorschach contained no evidence of a thinking disorder. Rather, his thinking style is naively inappropriate rather than bizarre. The stress has made him overly complicated, distracted by minor details (causing him to miss the "big picture"), and prevents him from attending to how he expresses himself. Mr. Battle has no channels for comfortable expression of feelings, and his affect is "bottled up." This constricted affect makes reality testing somewhat impaired, and has colored many areas of his life. He currently experiences more stress and pressure than he is capable of processing, and is quite close to falling apart. His stress tolerance is inadequate and available coping resources are absent. The affective distress is clearly impacting the clarity of thinking. The test also revealed that the ongoing experience of being alerted to need states for which he does not have adequate coping and delaying strategies causes the potential for impulsive and inappropriate actions. He has unexpected and relatively unorganized ideation intruding into consciousness with an intensity that demands action. The result can be poorly thought behaviors. The Rorschach contained no evidence of a psychotic disorder and there were no suicidal indicators. However, the situational stress has made him vulnerable to decompensation if additional pressure occurs. The test was consistent with affective problems which are adversely impacting cognitive clarity.

## SUMMARY AND CONCLUSIONS

Lawerence Battle underwent more than 15 hours of direct, face to face contact as part of a forensic psychological evaluation performed between August 19, 1998 and November 11, 1998. Multiple sources of data were utilized in arriving at the opinion that a workplace pattern of misconduct by FAA personnel resulted in the solidification of a generalized anxiety disorder which finally debilitated Mr. Battle on August 5, 1998.

Psychological testing and extensive clinical interviews established the presence of anxiety, depression, and impaired cognitive (intellectual) functioning. Analysis of the records and interviews with others collaborated the claimant's self report. Additionally, outside data sources revealed that Mr. Battle's psychological deterioration directly correlated with ongoing workplace misconduct. The workman's compensation claim for job related stress (traumatic injury) was objectively examined via a forensic psychological evaluation. Corroborative evidence from records review and interviews with co-workers supported his claim. The objective psychological test data revealed a psychiatric disorder. The forensic psychological evaluation also established the relevance between the claimed

injury and job related duties, and this evaluation ("medical report") discusses the specific employment factors and how these factors related to the claimed medical condition.

The body of this report addresses in detail the data that went into this psychological opinion that Mr. Battle sustained a workplace induced psychological injury because of agency misconduct that makes it impossible for him to return to the same or similar "dumping ground" environment as the one he was in when the DSM IV diagnoses solidified. Thus, it is my opinion that he will never recover from the workplace induced disability unless he works in an "operations" sort of position in an environment totally different than his current environment.

The following conclusions are based on the current findings. Prior to the initial EEO complaint (92-0318) Mr. Battle was an exemplary FAA employee who had earned a GS-14 rating for his excellent work. He was the first black male to occupy the position of Principle Evaluator in the Eastern Region He was commended for his work on numerous occasions, was nearing completion of a college degree, and was looking forward to additional promotions with the agency. Two significant career accomplishments occurred immediately prior to the discrimination charges: He was responsible for revising the Airway Facility Performance Examination, a $1.4 million project completed in the fall of 1992, and he was project manager establishing FAA Order 3400.3F (Airway Facilities Personnel Certification), completed in the summer of 1992. However, after not being selected for a Manager's position as a Sector Field Office Manager in 1991, he filed a racial discrimination complaint. This complaint was thought to be resolved when, on September 1, 1992, the parties signed an informal settlement agreement. The agreement was not honored and the Department of Civil Rights ordered the FAA to reopen the complaint. The EEOC Administrative Law Judge remanded the case to the Department of Transportation. The Agency subsequently dismissed the case on March 3, 1995. This was a long and psychologically draining process which would have not occurred "but for" the actions which gave rise to the original and subsequent complaints.

EEO Complaint 93-0292 was filed on May 26, 1993 for reprisal and racial discrimination. The Court date was scheduled for March 13, 1999 but the litigants settled out of Court for $80,000.00 on November 9, 1998. The settlement agreement also resolved six formal and informal complaints against the Agency including psychological abuse, emotional distress, threats from DOT officials, reprisals, and providing false information.

A July 1, 1998 confidential settlement agreement resolved the personnel record alteration and the original performance rating. However, more than 30 days elapsed and the FAA had not honored the agreement. Mr. Battle had to leave work on August 5, 1998 because

he was not getting straight answers about settlement agreement implementation., and his distress overwhelmed him. The FAA "stonewalling" was a continuation of a pattern of misconduct that Mr. Battle experienced during the past six years. Like the straw that broke the camel's back, he became psychologically incapacitated on August 5, 1998 and was unable to work.. A subsequent agreement addressing consequences for illegal records alteration was signed on October 21, 1998 but has not yet been implemented.

Workplace adversity has been going on for more than six years. It has spawned 10 EEO related complaints, and has adversely impacted Mr. Battle's psychological condition in many areas of psychosocial functioning, including:
- Economic (legal bills alone total $112,000.00)
- Occupational (loss of promotional opportunities, loss of 1,000+ hours of annual, comp and sick leave)
- Educational (he made the University of Maryland's Dean's List for the Fall Semester, 1992 but had to withdraw in the Fall of 1994 when the workplace stress escalated <only 15 semester hours from his BS degree>)
- Social (small and large family vacations have ceased, interest in sports has vanished, contacts with friends has decreased or stopped, and he no longer participates in enjoyable activities such as social gatherings or shopping)
- Medical ( weekly psychotherapy)

DSM IV diagnosis are as follows:
- AXIS I   300.02  (Severe) Generalized Anxiety Disorder
- AXIS II  V71.09  No Diagnosis
- AXIS III None
- AXIS IV (Occupational, financial, legal, social, medical, and educational problems)
- AXIS V  45 (current)

*Dick Brown, Ph.D* (11/12/98)

Dick Brown, Ph.D.
Licensed Psychologist